COLE SCHOTZ P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
David R. Hurst
Steven L. Klepper
Daniel F.X. Geoghan
Mark Tsukerman

*Counsel to the SunEdison Litigation Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SUNEDISON, INC., *et al.,*<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 16-10992 (SMB)<br><br>(Jointly Administered) |
| SUNEDISON LITIGATION TRUST,<br>                       Plaintiff,<br><br>– against –<br><br>SELLER NOTE, LLC; D. E. SHAW CF-SP SERIES 1 MWP ACQUISITION, L.L.C.;<br>D. E. SHAW CF-SP SERIES 8-01, L.L.C.;<br>D. E. SHAW CF-SP SERIES 10-07, L.L.C.; | Adv. Pro. No. 18-_____ (____) |

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE Minnesota Holdings, LLC (8926); SunE MN Development Holdings, LLC (5388); and SunE MN Development, LLC (8669). The address of the Reorganized Debtors' corporate headquarters is Two CityPlace Drive, 2nd floor, St. Louis, MO 63141.

|  |  |
|---|---|
| D. E. SHAW CF-SP SERIES 11-06, L.L.C.; D. E. SHAW CF-SP SERIES 13-04, L.L.C.; D.E. SHAW COMPOSITE HOLDINGS, L.L.C.; MADISON DEARBORN CAPITAL PARTNERS IV, L.P.; AND NORTHWESTERN UNIVERSITY,<br><br>Defendants. |  |

## ADVERSARY COMPLAINT

The SunEdison Litigation Trust, the Plaintiff herein (the "**Plaintiff**"), alleges that:

### NATURE OF THE CASE

1. This adversary proceeding seeks to avoid and recover, as constructively fraudulent, SunEdison Holdings'[2] transfer of approximately $400 million of Class B TERP shares to Seller Note for the Defendants' benefit. Seller Note is a special purpose entity and an indirect, wholly-owned subsidiary of SunEdison Holdings; it is not a debtor in the above-captioned cases. The Defendants are all immediate or mediate transferees and the ultimate beneficiaries of the transfer. The Plaintiff seeks judgment against the Defendants for the value of the transferred stock.

### JURISDICTION AND VENUE

2. This adversary proceeding is brought pursuant to Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure and sections 502(d), 544, 547, 548 and 550 of title 11 of United States Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**") and N.Y.D.C.L. §§ 272-275 and 278 and/or 279.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

---

[2] Undefined capitalized terms used in this paragraph are defined in the succeeding text.

4. Venue in this Court is proper pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises under and in connection with a case under the Bankruptcy Code that is pending in this District.

5. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O). Furthermore, Plaintiff consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6. As provided for in Paragraph 2 of the proposed *Order Granting SunEdison Litigation Trust's Motion for Order Establishing Procedures Governing Adversary Proceedings Pursuant to Sections 502, 547, 548 and 550 of the Bankruptcy Code* (the "**Procedures Order**"), the Avoidance Action Procedures (as defended in the Procedures Order) shall not apply to this adversary proceeding.

## BACKGROUND

**A.    The Parties**

7. Beginning on April 21, 2016 (the "**Petition Date**"), the above-captioned reorganized debtors (collectively, the "**Debtors**"), which include SunEdison, Inc. ("**SunEdison**") and SunEdison Holdings Corporation ("**SunEdison Holdings**"), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

8. At all relevant times herein, SunEdison is and was a renewable-energy development company, and is the ultimate parent of all of the Debtors. SunEdison Holdings is an indirect, wholly-owned subsidiary of SunEdison.

3

9. On March 28, 2017, the Debtors filed their *Joint Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates* [Docket No. 2671] (as amended from time to time, the "**Plan**").

10. On July 28, 2017, the Court entered the *Findings of Facts, Conclusions of Law and Order Confirming Second Amended Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates* [Docket No. 3735] (the "**Confirmation Order**"), thereby approving the Plan and the GUC/Litigation Trust Agreement (the "**Litigation Trust Agreement**").

11. On December 29, 2017, the Plan became effective [Docket No. 4495] (the "**Effective Date**").

12. Pursuant to the Plan, on the Effective Date, all of the Debtors' rights, title and interests in the GUC/Litigation Trust Causes of Action (as defined in the Plan), were transferred to Plaintiff.

13. Pursuant to the Plan, Plaintiff was authorized, as the representative of the Debtors' estates, to pursue the GUC/Litigation Trust Causes of Action, including the causes of action asserted herein. Plaintiff retains the right to enforce, sue on, settle or compromise all causes of action belonging to Plaintiff, including claims under sections 502(d), 547, 548 and 550 of the Bankruptcy Code.

14. Upon information and belief, defendant Seller Note, LLC ("**Seller Note**"), is a Delaware limited liability company and its principal place of business is or was at 13736 Riverport Drive, Maryland Heights, MO 63043. Seller Note's registered office and agent in the State of Delaware is CT Corporation, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

4

15. Upon information and belief, defendants D. E. Shaw CF-SP Series 1 MWP Acquisition, L.L.C.; D. E. Shaw CF-SP Series 8-01, L.L.C.; D. E. Shaw CF-SP Series 10-07, L.L.C.; D. E. Shaw CF-SP Series 11-06, L.L.C.; D. E. Shaw CF-SP 13-04, L.L.C.; and D. E. Shaw Composite Holdings, L.L.C. ("**DESCO**" and, collectively, "**D.E. Shaw**"), are Delaware limited liability companies with their principal place of business at 1116 Avenue of the America, 6th Floor, New York, New York 10036.

16. Upon information and belief, Madison Dearborn Capital Partners IV, L.P. ("**Madison Dearborn**"), is a Delaware limited partnership with its principal place of business at Three First National Plaza, Suite 4600, Chicago, Illinois 60602.

17. Upon information and belief, Northwestern University ("**Northwestern**", and together with Madison Dearborn, D. E. Shaw and Seller Note, the "**Defendants**") is an Illinois not-for-profit corporation with its principal place of business at 1800 Sherman Avenue, Suite 400, Evanston, Illinois 60201.

**B.    The January 2015 Transfer**

18. As of November 2014, SunEdison Holdings owned, among other things, valuable shares of Class B common stock ("**Class B Stock**") in Terraform Power, Inc. ("**TERP**") and Class B units (the "**Class B Units**") in TerraForm Power Operating LLC, one of TERP's operating subsidiaries. Class B Stock and Class B Units are privately held by SunEdison, as sponsor, and TERP's Class A common stock is publicly held. Class B Stock and Class B Units are exchangeable for a corresponding number of TERP's Class A common stock in accordance with its governing Registration Statement.

19. In November 2014, SunEdison, along with two of its non-debtor affiliates, TERP and Terraform Power, LLC ("**Terra LLC**", and together with SunEdison and TERP, the

5

"**First Wind PSA Buyers**"), entered into a purchase agreement (the "**First Wind PSA**") with DESCO, certain of DESCO's affiliates, Madison Dearborn, and others (collectively, the "**First Wind PSA Sellers**") to acquire (the "**First Wind Acquisition**") the First Wind PSA Sellers' interests in a renewable-energy company called First Wind Holdings, LLC and certain of its subsidiaries (collectively "**First Wind**").

20. The First Wind Acquisition closed on or about January 29, 2015. At the closing, Seller Note issued $336,470,000 aggregate principal amount of 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "**Exchangeable Notes**"). SunEdison irrevocably and unconditionally guaranteed payment of the Exchangeable Notes. SunEdison Holdings transferred (the "**January 2015 Transfer**") 12,161,844 shares of Class B Stock and 12,161,844 shares of Class B Units (collectively, the "**Transferred Property**") to Seller Note for the benefit of the Defendants. Seller Note then pledged its interests in the Transferred Property (the "**Pledged Collateral**") to the Defendants to secure Seller Note's obligations to the Defendants under the Exchangeable Notes and SunEdison's obligations under the guarantee.

21. Upon information and belief, SunEdison Holdings received no consideration or reasonably equivalent value for the transfer of the Transferred Property to Seller Note, all of which was made for the Defendants' benefit.

C. **The Debtors' Financial Deterioration and Events Leading to the Debtors' Financial Collapse**

22. Upon information and belief, the Debtors were experiencing critical liquidity issues and cash shortfalls as early as October 2014. In an attempt to manage their cash deficiencies, as of late 2014 and early 2015, the Debtors regularly revised their cash forecasts and requested their business units to identify "opportunities" that would preserve cash in order to minimize cash "burn." Also, the Debtors were routinely delaying accounts payable and

6

implemented a payment freeze in November 2014 in an effort to delay vendor payments, all which was symptomatic of the Debtors' weakened financial condition.

      23.    For example:

          a.    On October 8, 2014, Zach Groves, the Debtors' Director of Treasury, sent an internal email to certain SunEdison employees expressing his concern with the forecasted cash burn for the quarter and his frustration with the cash forecasting process. Mr. Groves stated:

> You will notice from the files that we are rolling up to a $375M burn, which would mean we break our liquidity covenant by $311M. . . . I know this is a horrible story, but without any of the CFOs or the two of you able to join the calls this week, the global teams are at a standstill. I have gone through 4 iterations with the teams that cut the burn down from $672M to $377M (approx. $300M better). . . . I am getting somewhat nervous about the timing of this tie out as people are coming out of the woodworks to try and get bills paid.

          b.    On January 5, 2015, Mr. Groves sent an email to Brian Weubbels, the Debtors' then Chief Financial Officer, and others, to provide an overview of the company's cash position in advance of a meeting. Mr. Groves noted: "The data shows a shortfall of free cash by mid-January and EOM January. We have listed some preliminary ideas to help fund any deficiencies in the 'opportunities' section."

          c.    On January 22, 2015, Mr. Groves sent an email to Sharon Fong, Manager of Financial Planning and Analysis, regarding delayed vendor payments that were being incorporated into the company's cash tracker. Mr. Groves stated: "Hate to be a pain, but we need this cleaned up. . . . You have blanket AP pushes in there for 79M that we'd like to see applied at the vendor level and you have one week where you are generating cash through AP." Ms. Fong replied that the company could not continue to delay payments to vendors.

7

d. On February 9, 2015, Mr. Groves sent an internal email to SunEdison employees stating: "I am getting very concerned about cash. As of right now we only have $25M left in the Corporate account."

e. In the summer of 2015, SunEdison addressed a situation in which the state of Massachusetts threatened a SunEdison director with a personal lawsuit for the company's failure to pay taxes for February, March and April of 2015, which is further emblematic of the company's "cash crisis" in early 2015. In an email sent in July 2015 by Jim McNeill, SunEdison Chief Tax Officer, to Roger Griffith, SunEdison then Treasurer, Mr. McNeill explained:

> [I] thought you should be aware of this situation since it could become an issue . . . . Carlos [Domenech] has been threatened with a personal suit for failure of NVT to pay tax in Massachusetts . . . . This was due to his personal responsibility as a director to have NVT remit tax withheld. This was all a result of our cash crisis and has nothing to do with any in A/P. Tax submitted for request for payment and it was simply not prioritized ahead of other cash needs. Everyone was aware of the potential consequences, but the need for working capital/acquisition funds trumped our fiduciary responsibilities.

24. In May 2015, the Debtors announced a series of planned acquisitions (the "**Planned Acquisitions**") that gave rise to billions of dollars of funding commitments, which were layered on top of the nearly $10 billion in debt that the Debtors were carrying at the end of the second quarter of 2015. In particular, in May 2015, the Debtors announced an acquisition of a South American renewable-energy firm, Latin America Power, for approximately $700 million (the "**LAP Acquisition**"). Then, in July 2015, the Debtors announced an agreement to purchase twelve hydroelectric and wind projects in Brazil for approximately $4 billion from Renova Energia, S.A. ("**Renova**"), and to purchase $250 million in securities of Renova from a third party. Finally, also in July 2015, the Debtors announced an agreement to purchase

8

residential rooftop solar power provider Vivint Solar ("**Vivint**") for $2.2 billion. None of these transactions ultimately was consummated.

25. Investors reacted negatively to the Debtors' acquisition plans—and the proposed Vivint transaction in particular. Indeed, between July 15, 2015 and August 31, 2015, SunEdison's stock value dropped by 70%, while the stock values of companies in its peer group dropped by just 10% to 15%. Thus, the drop in SunEdison's stock price was not attributable merely to market conditions, but rather was due to the Debtors' financial performance and capital structure.

26. The market also punished TERP's share price, which in turn led to further deterioration in the Debtors' liquidity position. In particular, in late July or early August 2015, additional funding requirements arose in connection with margin call requirements on a $400 million loan agreement that SunEdison and certain of its subsidiaries had entered into in January 2015 to fund the First Wind Acquisition. The loan agreement required the borrowers to maintain a certain loan-to-value ratio based upon the value of Class A common stock in TERP, which had decreased in value by approximately 25% in July 2015. In response to these margin calls, the Debtors were required to deposit $152 million into an escrow account as collateral during the third quarter of 2015, and deposit an additional $91 million in October 2015.

27. In early August 2015, just weeks after announcing the Vivint transaction, the Debtors sought to raise $300 million in much-needed capital through an initial public offering (IPO) of shares of Terraform Global, Inc. ("**Terra Global**"). However, the IPO failed and the Debtors were forced to contribute $30 million to fund the IPO short-fall. Moreover, the IPO saddled the Debtors with ongoing post-IPO financial and operational support obligations. The failed IPO furthered the rapid deterioration in the Debtors' market capitalization and, as of

9

late August 2015, several of SunEdison's debt issuances were trading substantially below par (65-75%).

28.     SunEdison's liquidity continued to decrease during the third quarter of 2015 by approximately another $200 million. Specifically, SunEdison's "free" cash (excluding TERP and Terra Global) declined from $461 million (as of June 30, 2015) to $308 million (as of September 30, 2015), and its availability under its first lien credit facility declined from $84 million (as of June 30, 2015) to $34 million (as of September 30, 2015). The situation had become critical, as SunEdison's remaining cash was barely sufficient to cover its quarterly cash "burn" of $250-300 million required to fund certain project development costs (pre-construction) and corporate overhead expenses. There was no cash left to fulfill other obligations, including those arising in connection with the Planned Acquisitions. For instance, after SunEdison failed to make a $355 million upfront cash payment in September in connection with the LAP Acquisition, the deal fell apart and Latin America Power shareholders sued SunEdison for its failure to close the transaction.

29.     During their chapter 11 cases, the Debtors sold all of their assets for a fraction of what they were estimated to be worth prior to their bankruptcy, demonstrating just how severe the Debtors' financial crisis had become before they finally collapsed into chapter 11.

30.     In summary, as of January 2015 and at the time of the January 2015 Transfer the Debtors, including SunEdison Holdings, were engaged in business or transactions, and/or were about to engage in business or transactions, for which they had unreasonably small capital. Indeed, as discussed further below, the First Wind PSA Buyers were unable to fulfill

their financial obligations and commitments to the First Wind PSA Sellers under the First Wind PSA, which was entered into in November 2014 and closed in January 2015.

31. By late 2015, SunEdison and its affiliated Debtors, including SunEdison Holdings, were deeply insolvent and/or were no longer able to pay their debts as they came due, and had entered into transactions (*i.e.*, the Planned Acquisitions) that they had no ability to consummate.

32. Moreover, Plaintiff has reason to believe that the Debtors may have provided inaccurate financial information to their lenders to secure financing for the Vivint transaction. Upon information and belief, the Debtors' financial activities in connection with the Vivint transaction may be subject to an investigation by the Criminal Division of the U.S. Department of Justice, and there is an ongoing investigation of the Debtors by the SEC "regarding its public disclosure of its liquidity position." This raises a question as to whether management provided inaccurate financial information to lenders or other users of the financial statements, and possibly even in connection with the First Wind Acquisition.

33. For these and other reasons, including certain identified material weakness in the Debtors' internal controls over financial reporting, Plaintiff has reason to believe that further investigation with respect to the Debtors' financial statements and reporting in late 2014 and early 2015 will lead to the discovery that the Debtors and SunEdison Holdings' financial position was markedly worse than reported.

34. Upon information and belief, the Debtors, including SunEdison Holdings, were already insolvent when the January 2015 Transfer occurred or were rendered insolvent as a result of the January 2015 Transfer.

11

35. Upon information and belief, Seller Note was already insolvent when the January 2015 Transfer occurred or was rendered insolvent as a result of the January 2015 Transfer

**D.     The January 22, 2016 Transfer**

36. By December 2015, the Debtors were in default under the Exchangeable Notes. On or about December 29, 2015, SunEdison and certain of its Debtor affiliates (namely, SUNE Hawaii Solar Holdings, LLC, First Wind Solar Portfolio, LLC, First Wind California Holdings, LLC, and SUNE Wind Holdings, Inc.) and Seller Note entered into purchase and sale agreement (the "**December 2015 PSA**") with the Defendants as a settlement of the default.

37. Pursuant to the December 2015 PSA, the Defendants released their interests in the Pledge Collateral to Seller Note and in contemplation of receiving 12,161,844 shares of Class A common stock in TERP.

38. On or about January 22, 2016, the Defendants received 12,161,844 shares of Class A common stock in TERP ("**January 22, 2016 Transfer**"), in the following amounts:

| D. E. Shaw CF-SP Series 1 MWP Acquisition, L.L.C. | Class A Shares of TerraForm Power, Inc. | 557,362 |
| D. E. Shaw CF-SP Series 8-01, L.L.C. | Class A Shares of TerraForm Power, Inc. | 297,766 |
| D. E. Shaw CF-SP Series 10-07, L.L.C. | Class A Shares of TerraForm Power, Inc. | 54,037 |
| D. E. Shaw CF-SP Series 11-06, L.L.C. | Class A Shares of TerraForm Power, Inc. | 274,524 |
| D. E. Shaw CF-SP Series 13-04, L.L.C. | Class A Shares of TerraForm Power, Inc. | 318,658 |
| D. E. Shaw Composite Holdings, L.L.C. | Class A Shares of TerraForm Power, Inc. | 4,578,575 |
| Madison Dearborn Capital Partners IV, L.P. | Class A Shares of TerraForm Power, Inc. | 6,078,970 |
| Northwestern University | Class A Shares of TerraForm Power, Inc. | 1,952 |

| Total | | 12,161,844 |
|---|---|---|

F.     **Amendments**

39.     During the course of this proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers of an interest of the Debtors in property made to or for the benefit of Defendants that may be recoverable under sections 547 or 548 of the Bankruptcy Code, including any preferential transfers made to Defendants during the ninety (90) days preceding the Petition Date and constructively fraudulent transfers made to the Defendants within two to six years preceding the Petition Date.[3]  It is Plaintiff's intention to avoid and recover all such transfers made by the Debtors.

40.     Plaintiff reserves the right to amend this original complaint to include: (i) further information regarding the Transfer(s); (ii) additional transfers; (iii) modifications of and/or revision to Defendants' names; (iv) additional defendants; and /or (v) additional causes of action (collectively, the "**Amendments**"), that may become known to Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original complaint.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**(Avoidance and Recovery of Constructively Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B) & 550)**

41.     Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint as though set forth at length herein.

---

[3] Plaintiff is investigating a potential claim against the Defendants to avoid and recover the January 22 Transfer to the Defendants as preferential, or alternatively, as constructively fraudulent.  Such a claim is derived from and based upon the same facts and circumstances which give rise Plaintiff's claim for the avoidance the January 2015 Transfer and recovery of the value of the Transferred Property from the Defendants.  Depending on the outcome of Plaintiffs' investigation, such a claim may subsequently be asserted and pled in the alternative.

13

42. Prior to the Petition Date, in or around January 2015, SunEdison Holdings transferred the Transferred Property to Seller Note to or for the benefit of the Defendants.

43. The January 2015 Transfer was of an interest of SunEdison Holdings in property.

44. SunEdison Holdings received less than reasonably equivalent value in exchange for making the January 2015 Transfer.

45. The January 2015 Transfer was made at a time when SunEdison Holdings was engaged or was about to engage in business or a transaction for which any property or assets remaining with SunEdison Holdings after the transfer represented an unreasonably small capital or were unreasonably small in relation to the business or transaction.

46. Through the January 2015 Transfer, SunEdison Holdings incurred, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they matured and became due.

47. The January 2015 Transfer was made at a time when SunEdison Holdings was insolvent or became insolvent as a result of the transfer.

48. Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550, the Plaintiff is entitled to avoid the January 2015 Transfer and seeks to recover the value of the Transferred Property at the time of the final judgment in this action. To the extent the January 2015 Transfer is avoided pursuant to section 548(a)(1)(B) of the Bankruptcy Code, the Transferred Property, or its value, may be recovered by Plaintiff from the subsequent transferees of the Transferred Property pursuant to section 550(a) of the Bankruptcy Code.

# SECOND CAUSE OF ACTION
### (Avoidance and Recovery of Constructively Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 544 and 550 and NYDCL § 272-275, 278 and/or 279)

49. Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint as though set forth at length herein.

50. At all times relevant to the January 2015 Transfer, there have been and are one or more creditors who hold matured or unmatured unsecured claims against SunEdison Holdings that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

51. The January 2015 Transfer constituted a conveyance by SunEdison Holdings of its property as defined in DCL § 270, which was made to or for the benefit of the Defendants.

52. SunEdison Holdings did not receive fair consideration in exchange for making the January 2015 Transfer.

53. The January 2015 Transfer was made at a time when SunEdison Holdings was engaged or was about to engage in business or a transaction for which any property or assets remaining with SunEdison Holdings after the transfer represented an unreasonably small capital or were unreasonably small in relation to the business or transaction.

54. Through the January 2015 Transfer, SunEdison Holdings incurred, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they matured and became due.

55. The January 2015 Transfer was made a time when SunEdison Holdings was insolvent or SunEdison became insolvent as a result of the transfer.

15

56. Pursuant to 11 U.S.C. §§ 544 and 550 and N.Y.D.C.L. §§ 272-275, and 278 and/or 279, the Plaintiff is entitled to have the January 2015 Transfer set aside and recover the value of the Transferred Property at the time of the final judgment in this action.

### THIRD CAUSE OF ACTION
**(Disallowance of Claims)**

57. Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint as though set forth at length herein.

58. Defendants are the recipients of the Transferred Property which is recoverable pursuant to sections 544, 548 and 550 of the Bankruptcy Code and sections 272 through 275, and 278 and/or 279 of the New York Debtor and Creditor Law, and Defendants have not returned the Transferred Property to Plaintiff.

59. Based upon the foregoing and pursuant to section 502(d) of the Bankruptcy Code, the claims, if any, asserted by Defendants against the Debtors (collectively, the "**Claims**") must be disallowed since Defendants have not paid or surrendered the Class A Stock and Class A Units, *i.e.*, the Transferred Property or its value, to Plaintiff.

### RESERVATION OF RIGHTS

60. Plaintiff hereby specifically reserves the right to bring any and all other causes of action that it may maintain against the Defendants including, without limitation, causes of action arising out of the same transaction(s) set forth herein, to the extent discovery in this action or further investigation by Plaintiff reveals such further causes of action.

WHEREFORE, Plaintiff prays that the Court enter a judgment against Defendants:

a. On Plaintiff's First Cause of Action, in favor of Plaintiff and against Defendants in an amount not less than the value of the Transferred Property, plus interest from

16

the date of the transfer until full payment is made to Plaintiff, together with the costs and expenses of this action, including, without limitation, attorneys' fees; and directing Defendants to turnover such sum to Plaintiff pursuant sections 548(a)(1)(B) and 550 of the Bankruptcy Code;

[Concluded on following page]

b. On Plaintiff's Second Cause of Action, in favor of Plaintiff and against Defendants in an amount not less than the value of Transferred Property, plus interest from the date of such transfer until full payment is made to Plaintiff, together with the costs and expenses of this action, including, without limitation, attorneys' fees; and directing Defendants to turnover such sum to Plaintiff pursuant to sections 544 and 550 of the Bankruptcy Code and sections 272 through 275 and 278 and/or 279 of the New York Debtor and Creditor Law;

c. On Plaintiff's Third Cause of Action, in favor of Plaintiff and against Defendants disallowing the Claims pursuant to section 502(d) of the Bankruptcy Code unless and until Defendants return the Transferred Property or its value to Plaintiff; and

d. Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
April 20, 2018

COLE SCHOTZ P.C.

/s/ Daniel F. X. Geoghan
David R. Hurst
Steven L. Klepper
Daniel F.X. Geoghan
Mark Tsukerman
1325 Avenue of the Americas
19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393

*Counsel to the SunEdison Litigation Trust*