UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                           :

In re:                                       :           Chapter 11

SUNEDISON, INC., *et al.*,            :           Case No. 16-10992 (SMB)

           Reorganized Debtors.     :           Jointly Administered

------------------------------------------------------------X

SUNEDISON LITIGATION TRUST,
Plaintiff,

                - against -

SELLER NOTE, LLC; D. E. SHAW CF-SP
SERIES 1 MWP ACQUISITION, L.L.C.;
D. E. SHAW CF-SP SERIES 8-01, L.L.C.;          Adv. Pro. No. 18-01537 (SMB)
D. E. SHAW CF-SP SERIES 10-07, L.L.C.;
D. E. SHAW CF-SP SERIES 11-06, L.L.C.;
D. E. SHAW CF-SP SERIES 13-04, L.L.C.;
D. E. SHAW COMPOSITE HOLDINGS, L.L.C.;
MADISON DEARBORN CAPITAL PARTNERS
IV, L.P.; AND NORTHWESTERN
UNIVERSITY,

           Defendants.

------------------------------------------------------------X

## MEMORANDUM DECISION GRANTING
## MOTION TO DISMISS THE AMENDED COMPLAINT

**A P P E A R A N C E S:**

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022

      Shannon Rose Selden, Esq.
      My Chi To, Esq.
      Erica S. Weisgerber, Esq.
      Melanie Burke, Esq.
      Brandon Fetzer, Esq.
          Of Counsel

*Attorneys for D. E. Shaw CF-SP Series 1 MWP Acquisition, L.L.C.; D. E. Shaw CF-SP Series 8-01, L.L.C.; D. E. Shaw CF-SP Series 10-07, L.L.C.; D. E. Shaw CF-SP Series 11-06, L.L.C.; D. E. Shaw CF-SP Series 13-04, L.L.C.; D. E. Shaw Composite Holdings, L.L.C.; Madison Dearborn Capital Partners IV, L.P.; and Northwestern University*

COLE SCHOTZ P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019

    Steven L. Klepper, Esq.
    David R. Hurst, Esq.
    Daniel F.X. Geoghan, Esq.
    Mark Tsukerman, Esq.
        Of Counsel

*Attorneys for the SunEdison Litigation Trust*

## STUART M. BERNSTEIN
## United States Bankruptcy Judge:

The SunEdison Litigation Trust ("Plaintiff") sued Seller Note, LLC ("Seller Note") and the other Defendants[1] seeking to avoid and recover, as constructively fraudulent, the transfer by SunEdison Holdings Corporation ("SunEdison Holdings") of certain securities to Seller Note. Seller Note pledged the securities to Wilmington Trust, N.A. ("Wilmington Trust") to hold for the benefit of the Defendants as collateral for certain exchangeable notes issued by Seller Note.

---

[1] The "Defendants" are D. E. Shaw CF-SP Series 1 MWP Acquisition, L.L.C.; D. E. Shaw CF-SP Series 8-01, L.L.C.; D. E. Shaw CF-SP Series 10-07, L.L.C.; D. E. Shaw CF-SP Series 11-06, L.L.C.; D. E. Shaw CF-SP Series 13-04, L.L.C.; D. E. Shaw Composite Holdings, L.L.C.; Madison Dearborn Capital Partners IV, L.P.; and Northwestern University. When used in this opinion, "Defendants" refers to these defendants but not Seller Note.

2

The Defendants have moved to dismiss the *Complaint*.[2] (*Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint*, dated Sept. 13, 2019 (the "Motion") (ECF Doc. # 20).) They contend, *inter alia*, that the safe harbor under 11 U.S.C. § 546(e) shields them from the Plaintiff's claims. I agree, and accordingly, the Motion is granted.

## BACKGROUND

### A.    The YieldCos and TERP

SunEdison Holdings was a wholly-owned subsidiary of SunEdison, Inc. ("SUNE"), a renewable-energy development company, and owned renewable energy systems such as solar arrays and wind farms ("Projects"). (¶ 7.)[3] SUNE either operated or sold the Projects to "YieldCos"[4] or other third-party purchasers. (¶ 17.) In March 2014, SUNE created a YieldCo subsidiary, TerraForm Power, LLC ("Terraform"). (*Id.*) On July 22, 2014, SUNE contributed Terraform to Terraform Power, Inc. ("TERP") concurrently with the IPO of TERP. (*Id.*) Following the IPO, SUNE, through SunEdison Holdings, maintained a majority stake in both Terraform and TERP. (¶ 18.) TERP is publicly traded on the NASDAQ under the ticker symbol "TERP" and has two classes of common stock: Class A, which is publicly held, and Class B, which was privately held by SunEdison Holdings. (¶ 19.) As of November 2014, SunEdison Holdings owned shares of Class B common stock (the "Class B Stock") in TERP and Class B units (the "Class B

---

[2]    The "*Complaint*" refers to the *Amended Adversary Complaint*, dated May 30, 2019 (ECF Doc. # 8). "ECF" refers to the docket in this adversary proceeding.

[3]    The notation "(¶ __)" refers to the paragraphs in the *Complaint*.

[4]    YieldCos are a collection of operating energy assets that are expected to produce foreseeable economic returns. (¶ 17 n.3.)

3

Units") in TerraForm Power Operating LLC, one of TERP's operating subsidiaries. (¶ 20.)

**B.    The Purchase and Sale Agreement**

On November 17, 2014, SUNE and TerraForm Power, LLC ("Buyers"), with TERP as guarantor, entered into a Purchase and Sale Agreement (the "2014 PSA")[5] with D. E. Shaw Composite Holdings, L.L.C. and certain of its affiliates, Madison Dearborn Capital Partners IV, L.P. and others to acquire their equity interests in a renewable-energy company called First Wind Holdings, LLC and certain of its subsidiaries (collectively, "First Wind"). (¶ 21; 2014 PSA § 2.01(a).)  SunEdison Holdings was not a party to the 2014 PSA.  (¶ 22.)

The Buyers agreed in the 2014 PSA to acquire different First Wind assets.  (¶ 23.) SUNE would purchase equity interests representing First Wind's development platform, pipeline and projects in various stages of development (the "SUNE First Wind Assets"). (*Id.*)  Terraform agreed to purchase equity interests representing First Wind's operating portfolio, which included wind and solar power generation assets (the "TERP First Wind Assets").  (*Id.*)

SUNE's portion of the purchase price was to be funded, in part, by exchangeable notes to be issued by a special purpose vehicle with a maximum aggregate principal amount of $350,000,000.  (¶ 24; 2014 PSA § 2.01(c).)  Alternatively, SUNE could pay the entire closing consideration in cash (i) upon ten business days' notice prior to

---

[5]    The 2014 PSA is attached as Exhibit A to the *Declaration of Brandon Fetzer in Support of Defendants' Motion to Dismiss the Amended Complaint*, dated Sept. 13, 2019 (the "*Fetzer Declaration*") (ECF Doc. # 21).

4

closing, and (ii) upon acceptance in writing of the cash alternative by certain Defendants. (2014 PSA § 2.01(d).) As conditions to closing, (1) the relevant parties had to execute an Indenture and a Pledge Agreement, (*see id.* § 8.01(h)(i)); (2) a special purpose entity (*i.e.*, Seller Note[6]) had to be formed, (*see id.* § 8.01(h)(ii) (describing formation of "SPV Issuer"); *id.* at p. 24 (defining "SPV Issuer" as "the special purpose entity . . . to be formed in connection with the issuance of the Exchangeable Notes")); (3) SunEdison Holdings had to contribute the aforementioned Class B Stock and Class B Units (collectively, the "Class B Securities") to Seller Note, (*see id.* § 8.01(h)(iv)); and (4) Seller Note had to pledge the Class B Securities to Wilmington Trust as "Collateral Agent." (*See id.* § 8.01(h)(v) (describing pledge to "Collateral Agent"); *id.* at p. 9 (defining "Collateral Agent" as Wilmington Trust).)

### C.     The January 2015 Transfer

Seller Note was formed as the special purpose vehicle on January 16, 2015. (¶ 26; *see* 2014 PSA § 8.01(h)(ii).) Thirteen days later, all of the transactions contemplated by the 2014 PSA took place:

     (i)     Seller Note issued 3.75% Guaranteed Exchangeable Senior Secured Notes due in 2020 in the amount of $336,470,000 (the "Exchangeable Notes") pursuant to an Indenture, dated Jan. 29, 2015 (the "Indenture"),[7] by and among Seller Note (as issuer), SUNE (as guarantor), and Wilmington Trust (as exchange agent, registrar, paying agent, and collateral agent). (¶ 27.a; 2014 PSA §§ 2.01(c), 8.01(h)(i); Indenture § 2.01, Preamble.)

     (ii)    SunEdison Holdings transferred 12,161,844 shares of Class B Stock and 12,161,844 shares of Class B Units (*i.e.*, the Class B Securities) to Seller Note to facilitate the First Wind acquisition under the 2014 PSA (the "Step One Transfer"). (¶ 27.b.)

---

[6]     Seller Note is an indirect, wholly-owned subsidiary of SunEdison Holdings, but is not a debtor. (¶ 13.)

[7]     The Indenture is attached as Exhibit B to the *Fetzer Declaration*.

5

(iii) Pursuant to a Pledge Agreement, dated Jan. 29, 2015,[8] between Seller Note and Wilmington Trust, Seller Note pledged its interests in the Class B Securities (the "Pledged Collateral") to Wilmington Trust to hold for the benefit of the Defendants (the "Step Two Transfer," and collectively with the Step One Transfer, the "January 2015 Transfer").[9] (¶ 27.b; Pledge Agreement § 2.01.)

As "Collateral Agent," Wilmington Trust held a first lien in the Class B Securities for the benefit of the Defendants. (*See* Indenture § 14.01; Pledge Agreement § 2.01.) In the event of a default, Wilmington Trust could sell the Class B Securities or otherwise enforce the lien to pay the Defendants. (*See* Indenture § 14.03(b)(i); Pledge Agreement § 3.01.) Upon satisfaction of the Exchangeable Notes, the liens on the Class B Securities would be released, and Wilmington Trust would reconvey the released collateral to Seller Note. (Indenture § 14.04.)

The First Wind transaction closed the same day, on January 29, 2015. (¶ 27.) The SUNE First Wind Assets were allocated to SunEdison Wind Holdings, Inc., a direct, wholly-owned subsidiary of SUNE. (¶ 29.) On February 19, 2015, SunEdison Wind Holdings, Inc. was renamed SunEdison Utility Holdings, Inc. (*Id.*) The TERP First Wind Assets were folded into TERP and its corporate structure. (¶ 30.)

**D.  The January 2016 Transfer**

During 2015, the financial condition of SUNE and its affiliates deteriorated. (*See* ¶¶ 34-40.) By December 2015, the Defendants claimed that SUNE and Seller Note were in default of certain obligations under the 2014 PSA and the Indenture. (¶ 48.) To address their alleged defaults, on December 29, 2015, SUNE, certain of its affiliates, and

---

[8]  The Pledge Agreement is attached as Exhibit C to the *Fetzer Declaration*.

[9]  The *Complaint* defines only the Step One Transfer as the "January 2015 Transfer." (¶ 27.b.) To be clear, in this decision the "January 2015 Transfer" refers to both the Step One and Step Two Transfers.

6

Seller Note entered into a purchase and sale agreement (the "December 2015 PSA")[10] with the Defendants. (*Id.*) Pursuant to the December 2015 PSA, the Defendants released their interests in the Class B Securities to Seller Note in contemplation of receiving 12,161,844 shares of Class A common stock in TERP. (¶ 49.) On January 22, 2016, at the instruction of the Defendants, Wilmington Trust delivered the Pledged Collateral to a transfer agent, which issued 12,161,844 shares of Class A common stock in TERP to the Defendants (the "January 2016 Transfer"). (*Id.*; December 2015 PSA § 2.01(b).) On the same day, Defendants delivered Exchangeable Notes in the aggregate principal amount of $121,470,000 to Wilmington Trust for cancellation.[11] (December 2015 PSA §§ 2.01(b), (c).)

E.     **The Chapter 11 Bankruptcy and Creation of the Litigation Trust**

Beginning on April 21, 2016 (the "Petition Date"), SUNE, SunEdison Holdings, and various other affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court"). (¶ 6.) Seller Note was not a debtor. (¶ 13.)

---

[10]    The December 2015 PSA is attached as Exhibit G to the *Fetzer Declaration*.

[11]    The parties have not contended that the December 2015 PSA affects the outcome of this adversary proceeding. Nevertheless, the only thing the Defendants received as a result of the Step One Transfer from Seller Note (through the Step Two Transfer) was a security interest in the Class B Securities. They did not receive legal title which remained in Seller Note. According to the *Complaint*, the Exchangeable Notes were cancelled, and the Defendants released their lien under the December 2015 PSA and through the January 2016 Transfer. (¶ 49.) In short, it appears that the parties unwound the Step Two Transfer and entered into a new transaction under which Seller Note issued in restricted book-entry form the 12,161,844 TERP Class A Shares in exchange for the Pledged Collateral. (December 2015 PSA § 2.01(b).) The Plaintiff does not assert a claim based on the January 2016 Transfer.

On July 28, 2017, the Court entered an order (the "Confirmation Order")[12] confirming the Debtor's Second Amended Plan of Reorganization (the "Plan").[13] (¶ 9.) On December 29, 2017, the Plan became effective (the "Effective Date").[14] (¶ 10.) Pursuant to the Plan, on the Effective Date, all of the Debtors' rights, title and interests in the GUC/Litigation Trust Causes of Action (as defined in the Plan) were transferred to Plaintiff. (¶ 11.) Plaintiff was authorized, as the representative of the Debtors' estates, to pursue the GUC/Litigation Trust Causes of Action, including the causes of action asserted in the *Complaint*, and pursue claims under sections 502(d), 547, 548 and 550 of the Bankruptcy Code. (¶ 12.)

**F.    The Adversary Proceeding and Motion to Dismiss**

Plaintiff commenced this adversary proceeding on April 20, 2018. The *Complaint* seeks to avoid the Step One Transfer (SunEdison Holdings' delivery of the Class B Securities to Seller Note) as a constructive fraudulent transfer and recover its value from the Defendants pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550 (Count I) and 11 U.S.C. §§ 544, 550 and N.Y. Debt. & Cred. Law §§ 272-275, 278 and/or 279 (Count II) on the alternative theories that the Step One Transfer was made for the Defendants' benefit, (¶¶ 27.b, 53, 62), *see* 11 U.S.C. § 550(a)(1), or the Defendants were subsequent transferees from Seller Note, the initial transferee (¶ 59), *see* 11 U.S.C. § 550(a)(2).

---

[12]    *Findings of Facts, Conclusions of Law and Order Confirming Second Amended Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates*, dated July 28, 2017 (ECF Doc. # 3735).

[13]    The *Second Amended Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates*, dated July 20, 2017, is attached as Exhibit A to the *Confirmation Order*.

[14]    *See Notice of Effective Date of Confirmed Second Amended Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates*, dated Dec. 29, 2017 (ECF Doc. # 4495).

Finally, the Plaintiff seeks to disallow claims asserted by the Defendants against the Debtors pursuant to 11 U.S.C. § 502(d) (Count III).

The Defendants filed the Motion on September 13, 2019. They made three arguments: (i) Bankruptcy Code § 546(e)'s safe harbor bars the Plaintiff's constructive fraudulent transfer claims, (Motion at 10-14); (ii) SunEdison Holdings received reasonably equivalent value for the transfer, (*id.* at 14-16); and (iii) the *Complaint* fails to allege that SunEdison Holdings was insolvent, possessed unreasonably small capital, or intended or believed that it would incur debts beyond its ability to pay as they matured at the time of the Step One Transfer. (*Id.* at 7-10; *see also Defendants' Reply Memorandum in Support of Their Motion to Dismiss the Amended Complaint*, dated Dec. 13, 2019 (the "Reply") (ECF Doc. # 24).) The Plaintiff's opposition, (*see Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint*, dated Nov. 15, 2019 (the "Opposition") (ECF Doc. # 23)), responded that (i) the safe harbor does not apply because Wilmington Trust's status as a "financial institution" raises a factual issue that cannot be decided on a motion to dismiss, and Wilmington Trust was not Seller Note's agent in connection with the Step One Transfer because Wilmington Trust did not facilitate the actual transfer of the Class B Securities to Seller Note, (Opposition at 20-26); (ii) SunEdison Holdings did not receive reasonably equivalent value for the transfer, (*id.* at 2-13); and (iii) the *Complaint* adequately alleges that SunEdison Holdings was insolvent or rendered insolvent at the time of the transfer. (*Id.* at 13-20).

9

## DISCUSSION

### A.  Standard of Review

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When deciding a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Legal conclusions pleaded in a complaint are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

In ruling on a motion to dismiss under Rule 12(b)(6), the Court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  If a document is not incorporated into a complaint by reference, "the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002))).  To consider such an integral document, there must be no dispute about "the authenticity or accuracy of the document" or "the relevance of the document." *Id.* (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

The *Complaint* incorporates by reference and relies on the 2014 PSA, the Indenture, and the December 2015 PSA.  (*See, e.g.*, ¶¶ 21-24 (describing the 2014 PSA and its terms); ¶ 27.a (describing the "Indenture dated January 29, 2015"); ¶¶ 48-49 (describing the December 2015 PSA).)  While the *Complaint* does not specifically name

10

the Pledge Agreement, the Plaintiff relies on its terms. (*See* ¶ 27.b (describing the terms and effect of the Pledge Agreement).) The Defendants attached these signed documents to their motion papers, they are relevant to the disposition of the Motion and the Plaintiff does not question their authenticity or accuracy. Thus, the Court may consider these documents in connection with the Motion.

**B.    The Section 546(e) Safe Harbor**

Section 546(e) of the Bankruptcy Code provides, in relevant part:

> Notwithstanding sections 544. . . [and] 548(a)(1)(B) . . . of this title, the trustee may not avoid . . . a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7), . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).[15] "The application of Section 546(e) presents a straightforward question of statutory interpretation of the type that is appropriately resolved on the pleadings." *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11MD2296 (DLC), 2019 WL 1771786, at *7 (S.D.N.Y. Apr. 23, 2019). "Put simply, the safe harbor applies where two requirements are met: (1) there is a *qualifying transaction* (i.e., there is a 'settlement payment' or a 'transfer payment . . . made in connection with a securities contract) and (2) there is a *qualifying participant* (i.e., the transfer was 'made by or to

---

[15]    Section 546(e) states:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

11

(or for the benefit of) a . . . financial institution)." *In re Nine West LBO Sec. Litig.,* 20 MD. 2941 (JSR), 2020 WL 5049621, at *6 (S.D.N.Y. Aug. 27, 2020) (emphasis in original).

### 1. The Relevant Transfer

Before considering these questions, the Court must identify the relevant transfer. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 892 (2018) ("Before a court can determine whether a transfer was made by or to or for the benefit of a covered entity, the court must first identify the relevant transfer to test in that inquiry."). The *Complaint* seeks to avoid only the Step One Transfer, and the Plaintiff urges the Court to ignore the subsequent pledge of Seller Note's interests in the Class B Securities to Wilmington Trust — the Step Two Transfer. (Opposition 22-26.) The Defendants disagree. They argue that the Step One Transfer must be considered in the context of the Step Two Transfer to Wilmington Trust, because the Step One Transfer would not have occurred without the parties agreeing to the Step Two Transfer. (Reply at 4-5.)

We begin with *Merit.* There, Valley View Downs, LP ("Valley View") acquired Bedford Downs Management Corp. ("Bedford Downs") by purchasing all of Bedford Downs' stock. 138 S. Ct. at 891. As part of the transaction, Valley View arranged for Credit Suisse to wire $55 million to third-party escrow agent Citizens Bank of Pennsylvania, which disbursed the money to the Bedford Downs shareholders. *Id.* Valley View subsequently filed for chapter 11 bankruptcy and confirmed a plan after which the litigation trustee brought a constructive fraudulent transfer action to avoid the transfer to Merit Management Group, LP ("Merit Management"), one of the shareholders, and recover its value. *Id.* Merit Management argued that the safe harbor

12

under 11 U.S.C. § 546(e) barred the claim because financial institutions acted as intermediaries and received the component transfers. *Id.* at 891-92.

The Supreme Court concluded that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions." *Id.* at 893; *accord In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 75, 77 (2d Cir. 2019), *petition for cert. filed*, 2020 WL 3891501 (U.S. July 6, 2020) (No. 20-8); *Nine West,* 2020 WL 5049621, at *14 (In *Merit*, "the Supreme Court held that 'the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid,' and 'not any component part of that transfer.'") (quoting *Merit*, 138 S. Ct. at 893). Thus, where a qualifying participant serves as a mere conduit or intermediary in connection with the overarching transaction between non-qualifying participants, the safe harbor does not apply. *See Merit*, 138 S. Ct. at 892, 897; *Tribune*, 946 F.3d at 75.

While *Merit* defined the relevant transfer as the overarching transfer that the trustee seeks to avoid, it does not follow that the trustee can escape the reach of the safe harbor by seeking to avoid an intermediate transfer between non-qualifying participants and sue the qualifying participants of the true overarching transfer as subsequent transferees. Such was the case in *Holliday v. K Road Power Mgmt., LLC* (*In re Boston Generating LLC*), 617 B.R. 442 (Bankr. S.D.N.Y. 2020). There, the debtor Boston Generating LLC ("BosGen") and its parent, EBG Holdings LLC ("EBG") decided to make a tender offer for the equity interests held by EBG's members and borrowed $2.1 billion primarily for that purpose. *Id.* at 451. The borrowed funds were deposited in BosGen's account with U.S. Bank, National Association ("US Bank"). *Id.* at 456. In the Step One

13

Transfer, BosGen caused US Bank to transfer approximately $708 million to EBG's account with Bank of America ("BoA"). *Id.* In the Step Two Transfer, EBG caused the $708 million in its BoA account to be transferred to its Bank of New York ("BONY") account to fund the tender offer. *Id* at 457. BONY served as BosGen's and EBG's agent and depositary in connection with the tender offer. *Id.* at 452. The Step One and Step Two Transfers were collectively defined as the BosGen Transfer. *Id.* at 456.

BosGen's liquidating trustee eventually brought an action designed, among other things, to avoid the Step One Transfer and recover its value from the redeeming equity holders (the recipients of the Step Two Transfer) as subsequent transferees of the Step One Transfer. *Id.* at 459. Under the liquidating trustee's theory, neither BosGen nor EBG were qualifying participants, and consequently, the safe harbor would not apply to the Step One Transfer. *Id.* at 491. Furthermore, if the liquidating trustee avoided the Step One Transfer, he could then recover its value from those subsequent transferees under 11 U.S.C. § 550(a)(2), even if they were qualifying participants, because the safe harbor defense only applies by its terms to the initial transfer. *Picard v. BNP Paribas, S.A.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018).

Agreeing with the defendants that the safe harbor barred the state fraudulent conveyance claims, the Court refused to disaggregate the two steps and viewed them as parts of the same overarching transfer. *Boston Generating*, 617 B.R. at 491-92. In particular, it ruled that the BosGen Transfer (*i.e.*, the two steps) was made "to complete a securities transaction" (*i.e.*, the tender offer), *id.* at 485, and "in connection with" a securities contract (*i.e.*, it was related to and associated with a securities contract, because it funded the redemptions made through the tender offer). *Id.* at 486-87. In

14

addition, BosGen and EBG were customers of BONY, a financial institution, which acted as their agent in connection with the tender offer. *Id.* at 489-91. Most important for present purposes, the Court ruled that under *Merit*, the Court must consider the overarching transaction and not limit its inquiry to the Step One component. *Id.* at 492 ("*Merit*'s holding does not instruct the Court to confine its inquiry to the Step One Transfer. In fact, *Merit* requires the opposite.")

In our case, the Step One Transfer was part of the overarching transaction described in the 2014 PSA, to wit, SUNE's purchase of the First Wind assets funded by notes secured by the Class B Securities. The 2014 PSA required the formation of a special purpose vehicle (*i.e.*, Seller Note) to issue the Exchangeable Notes that would partially fund SUNE's purchase. (2014 PSA § 8.01(h)(ii) (describing formation of "SPV Issuer"); *id.* at p. 24 (defining "SPV Issuer"); ¶ 24.) As conditions to closing, SunEdison Holdings would contribute the Class B Securities to Seller Note, (2014 PSA § 8.01(h)(iv)), and Seller Note would pledge the Class B Securities to Wilmington Trust, (2014 PSA § 8.01(h)(v)), to collateralize repayment of the Exchangeable Notes it issued pursuant to the Indenture.[16] This was an integrated transaction, a fact implicitly conceded by the Plaintiff, which asserts that the Step One Transfer was made to Seller Note "for the benefit of" the Defendants. (¶¶ 27.b, 53, 62.) Thus, the relevant transfer for the safe harbor inquiry is the January 2015 Transfer of Class B Securities from

---

[16] Although Wilmington Trust was not party to the 2014 PSA, it was contemplated when the 2014 PSA was executed that Wilmington Trust would serve as the Indenture Trustee and Collateral Agent. The 2014 PSA defined "Exchangeable Note Indenture" as "the Indenture for the Exchangeable Notes, to be dated on or around the Closing Date, among the SPV Issuer, as issuer, Holdco Buyer, as guarantor, and Wilmington Trust, National Association, as trustee and collateral agent . . . ." (2014 PSA at p. 13.) Furthermore, it defined "Exchangeable Note Trustee" to mean "Wilmington Trust, National Association, in its capacity as trustee under the Exchangeable Note Indenture." (*Id.*)

15

SunEdison Holdings through Seller Note to Wilmington Trust to secure the repayment of the Exchangeable Notes received by the Defendants.

### 2. The January 2015 Transfer Was Made "in Connection with" the 2014 PSA, a "Securities Contract"

Section 546(e) protects transfers made "in connection with a securities contract" to a qualifying participant. 11 U.S.C. § 546(e). The Defendants argue that SunEdison Holdings' transfer of Class B Securities was "made in connection with a securities contract," specifically the 2014 PSA.[17] The first step in the analysis is to determine whether the 2014 PSA was a "securities contract." The second step of the analysis is to determine whether the transfer was made "in connection with" the securities contract.

#### a. The 2014 PSA Was a "Securities Contract"

Section 546(e) refers to 11 U.S.C. § 741(7) for the definition of a "securities contract," *see* 11 U.S.C. § 546(e), and section 741(7) defines "securities contract" to include "a contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), and "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii). The definition of a "securities contract" is extraordinarily broad. *See In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418-19 (2d Cir. 2014) (noting "broad definition" of "securities contracts" under § 741(7)(A) and that "[f]ew words in the English language are as expansive as 'any' and 'similar.'"). The term "security" includes "stock," as well as any "other claim or interest commonly known as 'security.'" 11 U.S.C. § 101(49)(A)(ii), (xiv).

---

[17] The Defendants separately argue in a footnote that the transfer of Class B Securities was a settlement payment. (Motion at 14 n.12.) Arguments made in footnotes are forfeited. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011). This issue was not further briefed by either party in the papers, and the Court will not consider it.

LLC member units being purchased under the 2014 PSA qualify as securities. *See In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 473 (2d Cir. 2017) ("a membership interest in an LLC is a 'security'") (citing *O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (B.A.P. 9th Cir. 2013), *aff'd*, 782 F.3d 492 (9th Cir. 2015)); *Boston Generating*, 617 B.R. at 485.

The 2014 PSA is a contract for the purchase and sale of the First Wind LLC member units, which are securities. Thus, the 2014 PSA is a securities contract under 11 U.S.C. § 741(7)(A), and Plaintiff does not argue otherwise.

### b. The January 2015 Transfer Was Made "in Connection with" the 2014 PSA

Under "§ 546(e), a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract." *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d at 421. "Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided," "merely requir[ing] that the transfer have a connection to the securities contract." *Id.* at 422.

The January 2015 Transfer related to and was associated with the 2014 PSA because it was the means of effecting the partial payment of the purchase price under the 2014 PSA through the issuance of the Exchangeable Notes secured by the Pledged Collateral. *See Boston Generating*, 617 B.R. at 487 ("[T]his Court concludes that the BosGen Transfer funded the Unit Redemptions, the Warrant Redemptions, and the Distribution and thus, were made in connection with a securities contract."). Thus, the January 2015 Transfer of the Class B Securities was made "in connection with" the 2014 PSA, and the Plaintiff does not argue otherwise.

17

### c.     **Wilmington Trust Is a "Financial Institution"**

To be safe-harbored, the transfer must also be "made by or to (or for the benefit of)" a qualifying participant, which includes a "financial institution." 11 U.S.C. § 546(e). The Bankruptcy Code defines "financial institution" as:

> a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer

11 U.S.C. § 101(22)(A).

Wilmington Trust is a "financial institution" because it is identified as a bank on the Office of the Comptroller of the Currency website's Financial Institution Lists, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/index-financial-institution-lists.html. *See Tribune*, 946 F.3d at 78 (Computershare was a "financial institution" for the purposes of Section 546(e) because it is a trust company and a bank based on Office of the Comptroller of the Currency records); *Boston Generating*, 617 B.R. at 489 (finding that the Bank of New York is a "financial institution" for the purposes of Section 546(e) because it is a bank pursuant to the Office of the Comptroller website). In addition, the State of Delaware Office of the State Bank Commissioner lists Wilmington Trust as a "National Bank." (Delaware Financial Institutions[18] at 5.) The Court can take judicial notice of this information. *See In re*

---

[18]     The list of Delaware Financial Institutions, dated July 16, 2019, is attached as Exhibit I to the *Reply Declaration of Brandon Fetzer in Support of Defendants' Motion to Dismiss the Amended Complaint*, dated Dec. 13, 2019 (ECF Doc. # 25).

*Enron Corp.*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006) (taking judicial notice of an entity's status as a "financial institution" based on "records of various public or quasi-public bodies").

By isolating the Step One Transfer and ignoring the Step Two Transfer, the Plaintiff hopes to remove Wilmington Trust from the picture, focus exclusively on Seller Note and argue that Seller Note was not a financial institution. However, as discussed above, the relevant transfer of the Class B Securities contemplated by the 2014 PSA was from SunEdison Holdings through Seller Note to Wilmington Trust to collateralize the Exchangeable Notes. The deal was not simply the transfer of the Class B Securities from SunEdison Holdings to Seller Note; the Step One Transfer would not have occurred without agreement on the Step Two Transfer as well as the other components of the purchase and sale. Accordingly, the January 2015 Transfer was made to Wilmington Trust, a financial institution, in connection with the 2014 PSA, a securities contract. The Section 546(e) safe harbor shields the January 2015 Transfer and the component steps from the constructive fraudulent transfer provisions under bankruptcy and state law. Counts I and II are, therefore, dismissed.

## C.  **Reasonably Equivalent Value and Insolvency**

In light of the Court's conclusion that the safe harbor provides a complete defense to the Plaintiff's constructive fraudulent transfer claims, the Court does not reach the separate questions of whether the *Complaint* adequately pleads "reasonably equivalent value" or a financial condition, such as insolvency, necessary to support a constructive fraudulent transfer claim.

## D.  **Disallowance of Claims**

Section 502(d) provides that "the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 544 . . . [or] 548 . . . of this title." 11 U.S.C. § 502(d). Disallowance of a transferee's claim under section 502(d) rises and falls with the avoidability of the underlying transfer. Because the January 2015 Transfer is not avoidable, section 502(d) is inapplicable, and Count III is also dismissed.

For the reasons stated above, the Motion is granted, and the *Complaint* is dismissed. The Court has considered the Plaintiff's other arguments and concludes that they lack merit. Settle order.

Dated:  New York, New York
        November 2, 2020

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Court